UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

UNITED STATES OF AMERICA

v.                                                                        No. 18-cr-172-01-SM

JESSICA TEIXEIRA

**DEFENDANT'S SENTENCING MEMORANDUM**

Jessica Teixeira, through her counsel, submits this Sentencing Memorandum in support of her request for a variant sentence of 18 months' imprisonment in the Bureau of Prisons, followed by three years of supervised release.[1] The sentence requested is "sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

The seriousness of Jessica's offense is mitigated by her emotional distress over personal loss and struggles that motivated the offense and the mental illness that contributed to it. Jessica has serious medical issues related to her diagnosis of Type 2 Diabetes, and as an only child she is also primarily responsible for the care of her mother, Susan Teixeira, who is medically disabled from a prior brain infection and stroke, and suffers from significant memory loss.

Jessica is a non-violent offender with no prior criminal convictions for whom a lengthy term of imprisonment is neither indicated nor required. Further, the advisory guideline range recommended by the probation officer in this case, 41-51 months, is improperly calculated, and provides no useful advice, as it is not based on empirical data or national experience, and is far greater than necessary to satisfy any purpose of sentencing.

Grounds follow.

---

[1] Jessica has preserved two objections to the advisory guideline calculation which, if sustained, would result in a 24-30 month advisory guideline range. Jessica's sentence request would therefore fall just below the low end of the guideline range. Jessica requests that the Court vary below the advisory guideline range to impose the requested sentence, pursuant to *United States v. Booker*, 543 U.S. 220 (2005).

## I.   Introduction

On October 31, 2018, the grand jury for the District of New Hampshire returned a two-count Indictment, charging the defendant with Count 1: Securities Fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, and Count 2: Money Laundering, in violation of 18 U.S.C. § 1957.

On November 6, 2018, upon learning that an arrest warrant had issued, Jessica surrendered herself for initial appearance and arraignment. She pled not guilty and was released on bail conditions.

On March 4, 2019, the government filed a two-count Superseding Information charging Jessica with Count 1: Wire Fraud, in violation of 18 U.S.C. § 1343, and Count 2: Money Laundering, in violation of 18 U.S.C. § 1957.

A week later, on March 11, 2019, Jessica appeared in Court, waived her right to formal Indictment, and pled guilty to Counts 1 and 2 of the Superseding Information.

On April 4, 2019, Jessica again surrendered to the Court to face a bail revocation proceeding. The government withdrew one of two bail violations filed alleging that Jessica violated her condition that she not commit any offense in violation of federal state or local law while on release. The Court found probable cause to support the other and Jessica has been held in custody since that date.

Sentencing is set for August 7, 2019.

## II.   Advisory Guideline Range

Jessica has a criminal history score of zero, establishing a criminal history category (CHC) of I.

The guideline for a violation of 18 U.S.C. § 1957 is U.S.S.G. § 2S1.1, which directs that the base offense level is the offense level for the underlying offense since that offense level can

be determined in this case. The underlying offense is determined pursuant to U.S.S.G. § 2B1.1,

which calls for a base offense level of 7 because the offense of conviction has a statutory

maximum term of imprisonment of twenty years, and an increase of 12 levels, pursuant to

U.S.S.G. § 2B1.1(b)(1)(G), because the loss amount is more than $250,000 but not less than

$550,000.[2] The offense is increased one additional level because the offense of conviction is a

violation of 18 U.S.C. § 1957, pursuant to U.S.S.G. § 2S1.1(b)(2)(A).

      **Objection #1:** The probation officer has assessed a two-level increase, pursuant to

U.S.S.G. §§ 2B1.1(b)(2)(A)(iii) "because the offense resulted in the substantial hardship to one

victim[,]" Patrick Mulcahy. Jessica objects to imposition of this enhancement. Other than a bald

assertion by the probation officer that the victim suffered "substantial financial hardship,"[3] no

specific evidence has been offered to support the enhancement.

---

[2] Defense counsel has asked the government and/or the probation officer to provide documentation supporting the recommended loss amount and restitution figures in this case of $246,250 (re Patrick Mulcahy) and $50,000 (re Peter Morgan). Based on discovery it appears that at least $64,750 of amounts involving Mulcahy were characterized as "personal loans," not referenced in the government's offer of proof or in the Presentence Investigation Report. If this amount is subtracted from the loss amount then it would yield an increase not of 12 levels but of 10 levels, pursuant to U.S.S.G. § 2B1.1(b)(1)(F), because the loss amount would be more than $150,000 but not less than $250,000. Restitution may be impacted as well, as for the Mandatory Victim Restitution Act to apply, the harm must arise from the scheme charged in the Indictment (or in this case, the Superseding Information), which in this case did not involve "personal loans." *See* 18 U.S.C. § 3663A(2); *United States v. Foley*, 783 F.3d 7, 29 (2015) (fraudulent purchase of property did not fall within charged wire fraud scheme, thus lender's loss from purchase could not be included in restitution, although fraudulent purchase involved same fraudulent form and co-conspirators as scheme for which defendant was convicted).

[3] The probation officer summarily stated that the victim "has become insolvent; suffered substantial loss of a retirement, education, or other savings or investment fund; made substantial changes to his employment; and made substantial changes to his living arrangement." *Addendum to the Presentence Report, Document 25-1, p. 1.* These are factors described in the Commentary accompanying the enhancement. No facts specific to the victim as to any of these assertions were offered either in discovery or as part of the PSR.

**Objection #2:** Jessica also objects to the absence of a reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. Jessica should not lose credit for acceptance of responsibility. She took responsibility for this offense and she did so promptly, saving the government resources. She did not defraud Serge Golden of $2,500; rather she was working on a legitimate hemp flower distribution business plan and he agreed to invest. She was never charged with defrauding Mr. Golden, to the best of defense counsel's knowledge. Her bail in this case was violated on another ground, and she was incarcerated just one day after they met, and so she was unable to follow through. Jessica took prompt responsibility for the instant offense and is entitled to credit for acceptance of responsibility under U.S.S.G. § 3E1.1.

Without the two-level increase for "substantial financial hardship" under U.S.S.G. § 2B1.1(b)(2)(A)(iii), and with the three-level deduction for acceptance of responsibility for the offense under U.S.S.G. § 3E1.1, the total offense level in this case would be 17, rendering an advisory guideline sentencing range of 24-30 months (CHC I, TOL 17). The sentence Jessica is requesting is 6 months below the low end of that range.

## III.    Nature and Circumstances of Offense

For over 20 years Jessica Teixeira worked as a full-time nanny for several Massachusetts families, from 1995 to 2016. In 2016 she lost her job as a nanny for one Newton (MA) family after being accused of improper use of the patriarch's credit card. While this did not result in a criminal conviction, publicity on social media and elsewhere impacted Jessica's ability to find another nanny position.

To support herself Jessica developed her own web-based business, Ms. Goldilox (www.msgoldilox.com), offering concierge services to busy families. This was something that Jessica had started planning while working as a nanny; without a regular job she put more time

4

and energy into developing it. Jessica also looked for investors to invest in a plan she had developed to franchise day care centers in airports. As part of Ms. Goldilox, Jessica procured concert and sporting event tickets for customers, and helped them with personal staffing needs, as well as with project planning and execution. To make ends meet Jessica also sold Isagenix products (nutritional shakes and supplements for a weight loss system, *see* www.isagenix.com).

Despite her best efforts, Jessica's various businesses foundered. Jessica's mother was afflicted with a brain infection in 2009; during her recovery, she suffered a stroke, resulting in significant brain damage and memory loss. Her condition worsened in 2016, coinciding with Jessica's job loss and business failure. As Jessica became more involved with her mother's care and support, she made reckless choices, misrepresenting facts to potential investors in an effort to secure more funding to shore up her fledgling business ventures.

Represented among potential investors were two men, Patrick Mulcahy and Peter Morgan. Jessica convinced Mulcahy, and then Morgan, to invest in fictitious investment schemes offering a guaranteed rate of return. Mulcahy ultimately invested a large sum of money with Jessica as part of what she represented was a land deal. Morgan, a sophisticated real estate investor introduced to Jessica by Mulcahy, invested a smaller amount in a deal which also purported to involve real estate. This was by no means a sophisticated fraud. Jessica provided no documentation to these men other than, at least in some instances, a one-page Word document to confirm the investments and repayment terms. The men both made checks out to Jessica personally; she cashed them at the banks they were drawn on.

Neither Mulcahy nor Morgan received any return on their investments; Jessica spent the money to support herself while pursuing her various business ventures, which she also discussed

with Mulcahy and Morgan. It was always Jessica's intent to repay both men with proceeds from her businesses, once they were profitable.

Approached and interviewed (and recorded surreptitiously) by FBI agents on August 13, 2018, Jessica admitted to entering into the bogus investment contracts with Mulcahy and Morgan. She was arrested and arraigned just two months later, in November 2018. Within four months, on March 11, 2019, Jessica pled guilty in this Court to Wire Fraud and Money Laundering (18 U.S.C. §§ 1343 & 1957). She will be sentenced on August 7, 2019.

Jessica asks the Court to consider not just her criminal acts, which clearly lacked sophistication, but also her lack of any prior criminal history, the mental illness and personal struggles that fueled her crimes, and her desire to make restitution to the victims. A sentence within the suggested advisory guideline range of 41 to 51 months is in excess of what is just or necessary in this case. A sentence of 18 months in prison followed by three years of supervised release is a just result.

## IV.    History and Characteristics of Defendant

The almost-42-year-old Jessica Teixeira was born in 1977 in Framingham, Massachusetts, the only child of Manuel Alves Teixeira and Susan Marie (nee DeRoche) Teixeira. Jessica's parents divorced in the early 1980s, and Jessica was raised from age 5 by her single mother. Susan worked many different jobs - bartender, nanny, deli clerk, grocery store cashier, telefundraiser, waitress, caterer, cook, interior design product salesperson - to support Jessica and make ends meet. Manuel, Jessica's father, a Vietnam-era veteran, returned from his service addicted to heroin; he spent the rest of his life salving his psychic wounds with drugs and alcohol.

Manuel, who worked in factories, paid very little child support to ex-wife Susan while Jessica was growing up. Susan received welfare, and Manuel was court-ordered to pay her $65 a week, which he did only intermittently. Manuel lived with his mother (Jessica's grandmother), Erminda Teixeira, in a four-decker wood-frame house she owned in Milford, Massachusetts, and which Manuel inherited from her when she passed away in 2005.

Jessica's relationship with her father was always troubled, mainly due to his chronic drinking and drug use, and became even more so as Jessica moved from adolescence into adulthood, and the disappointments piled up.[4] When Manuel died at age 66 in 2015, he left the house he had inherited to his niece and nephew (Jessica's cousins), cutting Jessica out of his will completely. This understandably made Jessica sad and bitter, as she had always been told she would inherit it. Nevertheless, Jessica delivered a moving eulogy at her father's funeral, a copy of which is attached as Exhibit A.

Jessica graduated from Milford (MA) High School in 1995. She attended community college in Massachusetts for a couple of years but never graduated.[5] While she had been a good student, without her parents' financial support, Jessica could not afford to continue in college, and had to work to support herself and her mother, who started having brain seizures during Jessica's freshman year.

As her mother had, Jessica worked as a nanny. From 1995 to 2016 she worked for six different families, until she was fired from one job in 2016 and was unable to find another. On

---

[4] Jessica was fired from one nanny position in May 2014, after missing three days' work in a row as she attended her father's deathbed and arranged for his last rites. He survived to live another nine months, and received his last rites a second time before dying in March 2015.

[5] The PSR indicates that Jessica earned her Bachelor's Degree at Regis College. This is incorrect. She took a couple of classes there but never matriculated, and never earned a degree.

the cusp of turning 40 Jessica found herself without a college education and with no other skills

than those picked up over twenty years as a nanny.

Jessica is in poor health. She previously weighed 560 pounds, and lost more than half her

weight through diet and exercise. She is still overweight and was recently diagnosed with Type 2

diabetes and is prescribed medication to control it. According to her doctor, she is supposed to be

eating a diabetic diet, low in saturated fat and carbohydrates, with plenty of vegetables, fruits and

lean proteins, to control her blood sugar. The diet she has been receiving in the county jail is

somewhat restricted in calories, but otherwise high in simple carbohydrates (sugar, starch, and

processed foods), and lacking the vegetables, fruits and lean proteins prescribed by her

physician. Also, while detained pretrial, Jessica's four front teeth fell out (they had been

connected by a defective veneer) and she is in need of a denture.

While awaiting sentencing Jessica underwent a psychological evaluation by Dr. Eric G.

Mart, Ph.D., ABPP, which revealed that episodes of hypomania underlay her criminal conduct in

this case. According to Dr. Mart:

> The hypomanic episode is a distinct period of persistently elevated or irritable mood
> lasting for at least four consecutive days. Symptoms of hypomania include increased
> activity level, strong feelings of physical and mental well-being, reduced need for sleep,
> and overconfidence in one's own abilities. In other cases the individual may become
> easily annoyed and verbally aggressive. Individuals who are experiencing hypomanic
> activation may engage in activities that have a high potential for negative consequences.
> The Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, of the
> American Psychiatric Association notes that these activities may include "engaging in
> unrestrained buying sprees, sexual indiscretions, or foolish business investments." In my
> clinical interview, Ms. Teixeira reported symptoms consistent with hypomania.

*See Confidential Psychological Report, Dr. Eric. G. Mart, Ph.D., ABPP, p. 8. (to be submitted*

*separately under seal).*

Dr. Mart further opines that Jessica

… has long-standing feelings of anger and resentment towards others and that these feelings and attitudes are related to her extremely problematic relationship with her father. Her suspicion and cynicism towards others helped her to justify her criminal actions, and I believe it is likely that her hypomania led to her engaging in those activities without due consideration of the risks she was taking and the high likelihood of her being eventually found out. I do not believe that these factors overcame her knowledge of the wrongfulness of her actions, but I do believe they were contributory.

From a treatment standpoint, Ms. Teixeira would benefit from further psychiatric assessment, and the consulting psychiatrist should be provided with this report. Ms. Teixeira may benefit from psychopharmacological intervention designed to stabilize her moods. She may also benefit from a mix of cognitive behavioral and insight-oriented psychotherapy to help her understand her underlying emotions and also to develop strategies for behavioral control.

*Id.*

Jessica's extreme emotional distress at the loss of her father, after a long, troublesome relationship, provoked a hypomanic episode in which she became grandiose and impulsive. This manifested an underlying mental disease that is treatable with medication and psychotherapy. Jessica felt trapped by her initial actions and could not figure another way out; thus, she persisted in the plan, hoping to use the fraudulently acquired funds to launch her business and thus to eventually repay all that she had misappropriated. Were it not for the stressors of her personal loss and struggles - the loss of her 20-year nanny career, the failure of her business ventures, her father's death from drug and alcohol abuse at a relatively young age, and her mother's worsening illness - which combined to provoke an episode of hypomania, it is unlikely that Jessica would have engaged in the behavior that she did.

Finally, Jessica does not have a prior criminal history, indicating this episode was exceptional behavior for her.

###### V.        Factors Supporting a Below-Guideline Sentence

In the advisory guideline regime, the guideline sentence is only a starting point for

arriving at the proper sentence under 18 U.S.C. § 3553(a). *See Gall v. United States*, 552 U.S.

38, 49 (2007). Not only are the guidelines merely advisory, they are "also not to be presumed

reasonable." *Nelson v. United States*, 550 U.S. 350, 352 (2009). Rather, the guidelines "'reflect a

rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough v.*

*United States*, 552 U.S. 85, 109 (2007) (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)).

In imposing an appropriate sentence, this Court should make an "individualized

assessment based on the facts presented." *Gall*, 552 U.S. at 50. The Court's final determination

must meet "§ 3553(a)'s overarching instruction to 'impose sentence sufficient, but not greater

than necessary' to accomplish the sentencing goals advanced in [§] 3553(a)(2)," namely,

retribution, deterrence, incapacitation, and rehabilitation. *See Kimbrough*, 552 U.S. at 111.

The formulaic application of the guidelines would not in this case lead to a fair and just

sentence. Jessica asks the Court to consider the following factors[6] in imposing a below-guideline

sentence of 18 months of incarceration:

### A.  Jessica's offense was motivated by her personal struggles and exacerbated by her hypomania.

Jessica's offense grew out of a confluence of unfortunate events to include the loss of her

20-year career as a nanny, her father's death and her concomitant feelings of abandonment upon

learning that he had cut her out of his will, and her increased responsibilities as her mother's

---

[6] The guidelines take no account of these factors, yet they, as well as Jessica's prompt acceptance of responsibility, are surely appropriate to consider. *Cf. Koon v. United States*, 518 U.S. 81, 113 (1996) ( "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.")

caretaker in the wake of a disabling brain injury. Exacerbating her feelings of loss and abandonment, and the pressures created by her mother's poor health, was her hypomania, as detailed in Dr. Mart's report. These facts give context to Jessica's unlawful actions. They also suggest a road map for ensuring that she will not commit other crimes in the future. Psychotherapy, cognitive behavioral treatment, and psychiatric medication will all be useful tools to ensure that Jessica's conduct is not repeated. *See, e.g., United States v. Meyers*, 503 F.3d 676 (8th Cir. 2007) ("district court did not abuse its discretion in finding that a shorter period of incarceration, with mental health treatment and supervised release, is the most effective sentence").

### B.  Jessica's conduct was aberrant.

Jessica lived a law-abiding life until the instant offense began in her late 30s/early 40s. She was a trusted and dedicated nanny for many families, over many years. She did not engage in criminal conduct until she became emotionally distraught over the loss of her father, exacerbated by her hypomania. Her offense is completely uncharacteristic when viewed in the context of her entire productive adult life. This Court should grant a variance based on the aberrant nature of her conduct. *See, e.g.,United States v. Howe*, 543 F.3d 128 (3rd Cir. 2008) (variance based on "isolated mistake" in otherwise long and entirely upstanding life); *United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) (defendant was a "law abiding citizen, who [did] an incredibly dumb thing"); *United States v. Davis*, 2008 WL 2329290 (S.D.N.Y. June 5, 2008) (defendant was a first offender who had worked throughout his 15-year marriage to educate his six children and whose offense was prompted by economic pressures).

### C.  Jessica is in poor physical health.

Jessica is in poor health due to her Type 2 Diabetes and her health has deteriorate since she was incarcerated. Jessica's doctors have prescribed a diabetic diet for her that is rich in vegetables and fresh fruit; she has requested a diabetic diet since she was incarcerated but it has been denied her. Instead she was given a "restricted-calorie" diet which is essentially the same, starchy diet non-diabetics receives, without dessert. As a result Jessica's blood sugar has been swinging wildly up and down, and she feels awful much of the day. Also, in what seems to be punishment for complaining about the poor diet at the jail, Jessica has been prohibited from working at the jail, supposedly because of her diabetes.

The longer Jessica is incarcerated, the more likely it is that her health will be permanently affected. A 24-month sentence is long enough to punish her for her transgressions. Anything longer is excessively punitive, given the deleterious impact incarceration will have on her health as compared to other, non-diabetic inmates. *See, e.g., United States v. Almenas*, 553 F.3d 27 (1st Cir. 2009) (affirming downward variance of 43 months below the bottom of the guideline range based on defendant's combination of physical and mental disabilities).

### D.  Jessica's mother is disabled after suffering a brain infection and stroke and Jessica is responsible for her care.

Jessica's mother Susan Teixeira suffered from a brain virus and subsequent stroke which sharply affected her memory. As Jessica puts it, she has good days and bad days. While she lives independently, Jessica helps her with many of her daily tasks, including shopping, and cleaning, and make sure she takes her medication and attends her medical appointments.

It has been challenging for Susan to manage these tasks without Jessica's assistance; fortunately she has a couple of good friends to assist her in Jessica's absence. But as Susan's

only child, Jessica is primarily responsible for her mother's care, and a lengthy term of incarceration could put her health at risk.

Courts have held that this type of obligation to a sick family member is a mitigating factor and can be relied on to support a departure or variance. *See, e.g., United States v. Schroeder*, 536 F.3d 746 (7th Cir. 2008) (remanding for resentencing where the sentencing court did not address defendant's claim of extraordinary family circumstances: "[w]hen a defendant presents an argument for a lower sentence based on extraordinary family circumstances, the relevant inquiry is the effect of the defendant's absence on his family members.)

### E. The Fraud Guideline (U.S.S.G. § 2B1.1) provides no useful advice because it is not based on empirical evidence or national experience and fails to promote any purpose of sentencing.

When Congress enacted the Sentencing Reform Act of 1984, it directed the Commission to promulgate guidelines that "assure the meeting of the purposes of sentencing," 28 U.S.C. § 991(b)(1)(A), and to use average sentences imposed and prison time actually served in the preguidelines period as a "starting point." 28 U.S.C. § 994(m). The Commission was then to continually review and revise the guidelines in light of sentencing data, criminological research, and consultation with frontline actors in the criminal justice system. *See* 28 U.S.C. § 991(b)(1)(C), § 991(b)(2), § 994(o), § 995(13), (15), (16).

The original Commissioners abandoned the effort to design the guidelines based on the purposes of sentencing because they could not agree on which purposes should predominate, and instead purportedly based the guidelines on an empirical study of time served for various offenses before the guidelines. *See* U.S.S.G., Ch. 1 Pt. A(3); Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 7 (1988).

In *Rita v. United States*, 551 U.S. 338 (2007), the Supreme Court gave two reasons that it may be "fair to assume" that the guidelines "reflect a rough approximation" of sentences that "might achieve § 3553(a)'s objectives." First, the original Commission used an "empirical approach" which began "with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past." Second, the Commission can review and revise the guidelines based on judicial feedback through sentencing decisions, and consultation with other frontline actors, civil liberties groups, and experts. *Id*. at 348-50.

The Court recognized, however, that not all guidelines were developed in this manner. *See Gall v. United States*, 552 U.S. 38, 46 & n.2 (2007); *Kimbrough v. United States*, 552 U.S. 85, 96 (2007). When a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," because the Commission "did not take account of 'empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Id.* at 109-10.

The fraud guideline is not based on empirical data of past practice or on national experience since then. Because the Commission failed to rely on empirical data or national experience in promulgating or amending § 2B1.1, and thus failed to fulfill its institutional role, this Court is free to disagree, on reasoned policy grounds, with its recommendation. *See Spears v. United States*, 129 S. Ct. 840, 843 (2009); *Kimbrough*, 552 U.S. 101-02, 109-10; *Rita*, 551 U.S. at 351, 357.

**F.  Jessica wishes to work, so she can make restitution to the victims.**

In determining the appropriate sentence, this Court must consider "the need to provide restitution to any victims of the offense." *See* 18 U.S.C. §3553(a)(7); *see also*, *e.g.*, *United States*

14

*v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006) (acknowledging district court's discretion to depart from guidelines to impose probationary sentence, since the "goal of obtaining restitution for the victims of Defendant's offense . . . is better served by a nonincarcerated and employed defendant"); *United States v. Peterson*, 363 F. Supp. 2d 1060, 1061-62 (E.D. Wis. 2005) (granting a variance so that defendant could work and pay restitution). The victims in this case have stressed the need for restitution, and Jessica wishes to provide it. She is hardworking, and has some skills; she successful in caring for children for over two decades. There is every reason to believe that she can obtain a job once she is released and properly treated for her medical and mental health problems. If Jessica were sentenced within the currently-calculated advisory guideline range, she would not be released until well into her mid-40s. This Court should seek to maximize Jessica's ability to make the restitution the victims have demanded, by imposing a shorter term of imprisonment than the current guideline range recommends.

G. **The offense level overstates the seriousness of the offense, because it is based on a loss amount which includes personal loans as well as monies fraudulently solicited for investment.**

Jessica moves for a variance in part because the loss amount and thus the offense level overstates the seriousness of the offense. As is evident from the agreements between Jessica and Mulcahy attached as Exhibit B, at least $64,750 of the amounts Mulcahy paid Jessica (just counting checks and not counting "reinvested interest") were characterized as "personal loans," which were not referenced in the Superseding Information, the government's offer of proof, or the PSR. These are arguably not relevant conduct under U.S.S.G. § 1B1.3 as they were not part of the common plan or scheme with the offense of conviction. But even if the Court determines that they were part of a common scheme or plan, they are clearly of a different nature than the funds Jessica solicited for the fictitious land deals. If the amounts characterized as "personal

loans" are severed from the other amounts, the loss amount in this case would be 2 levels lower

pursuant to U.S.S.G. § 2B1.1(b)(1)(G), as the loss amount would be more in the nature of a loss

amount of $150,000 to $250,000. If the Court does not reduce the offense level by 2 levels then a

small variance may be in order to adjust Jessica's sentence to account for the fact thatn the

guideline range here overstates the seriousness of the offense (i.e. the amount that Jessica

intended to defraud Mulcahy of should not include those amounts which he loaned her

personally and which were neither charged in the Information, described in the government's

offer of proof, or included by reference in the PSR.

### H. Jessica is a first time, nonviolent offender for whom a lengthy prison term is neither necessary nor appropriate.

Jessica is a 41-year-old, CHC I, nonviolent offender with important family obligations

and serious medical issues of her own, who wishes to make restitution, and does not need to be

locked away in prison for a lengthy period to protect society or to be corrected. Congress

directed the Commission to "insure that the guidelines reflect the general appropriateness of

imposing a sentence other than imprisonment in cases in which the defendant is a first offender

who has not been convicted of a crime of violence or an otherwise serious offense," and the

"general appropriateness of imposing a term of imprisonment on a person convicted of a crime

of violence that results in serious bodily injury." 28 U.S.C. § 994(j). Congress issued this

directive in the belief that "sentencing decisions should be designed to ensure that prison

resources are, first and foremost, reserved for those violent and serious criminal offenders who

pose the most dangerous threat to society," and that "in cases of non-violent and non-serious

offenders, the interests of society as a whole as well as individual victims of crime can continue

to be served through the imposition of alternative sentences, such as restitution and community

service." *See* Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (set forth at 18 U.S.C. §

16

3551 note). *See, e.g.*, *United States v. Darway,* 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-offender status).

Jessica is plainly not a violent and serious offender who poses the most dangerous threat to society. She needs medical attention and mental health treatment from competent providers, wishes to work in order to make restitution, and should be not be incarcerated for a lengthy term.

## VI.    No Memorandum of Law

No separate memorandum of law is attached as all points and authorities are contained herein.

## VII.    Other Considerations

Jessica requests that the Court schedule a separate hearing on restitution within 90 days pursuant to 18 U.S.C. § 3664(a)(5).

Jessica requests that the Court recommend that her Type 2 Diabetes be properly treated while she in incarcerated in the Bureau of Prisons, that sher be designed to a Care Level 2 institution, and that she be given access to a diabetic diet which includes vegetables, fruits, and lean proteins, prescribed by her physician.

Jessica also requests that the Court recommend while she is incarcerated, and order while she is on supervised release, that she be given access to mental treatment and counseling services.

## VIII.   Request for Relief

Wherefore, the defendant, Jessica Teixeira, through counsel, respectfully requests this Court sentence her as requested herein, and for such other relief as may be deemed just.

Date: July 29, 2019                                    Respectfully Submitted,

                                                       */s/Jeffrey S. Levin*
                                                       Jeffrey S. Levin (NH Bar #12901)
                                                       Assistant Federal Defender
                                                       Federal Defender Officer
                                                       22 Bridge Street, Box 12
                                                       Concord, NH 03301
                                                       Tel. 603-226-7360
                                                       Email: Jeff_Levin@fd.org


## Certificate of Service

        I hereby certify that on July 29, 2019 the above document was served via CM/ECF to all counsel of record and that a copy will be given to the defendant.

                                                       */s/ Jeffrey S. Levin*
                                                       Jeffrey S. Levin