UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

UNITED STATES OF AMERICA

v.  Cr. No. 18-cr-00172-01-SM

JESSICA TEIXEIRA

**MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A)**

Jessica Teixeira, by and through her counsel, respectfully moves this Court to grant her compassionate release under 18 U.S.C. § 3582(c)(1)(A), and reduce her sentence to time served and/or to order that all or some portion of the remainder of her prison sentence (approximately 21 months) be served on home confinement, as a condition of her term of supervised release.

This motion should be granted due to the "extraordinary and compelling reasons" confronting the federal prison system (and particularly FCI Danbury, where he is currently housed) by the COVID-19 pandemic, and Jessica's heightened risk of severe illness and death should she contract the virus, as an obese person with diabetes mellitus, type 2. The 18 U.S.C. § 3553(a) factors would not be undermined by converting her remaining prison sentence (approximately 20 months) or a portion thereof to home confinement given the unique circumstances of the current pandemic.

**BACKGROUND**

**I.    Case History**

On March 13, 2019, Jessica Teixeira waived indictment and pled guilty to a two-count Superseding Information charging her with Wire Fraud (18 U.S.C. § 1343) and Money Laundering (18 U.S.C. § 1957). On August 7, 2019, Jessica was sentenced to 41 months on each count, sentences to be served concurrently, with 3 years of supervised release to follow. Jessica was ordered to pay $296,250.00 in restitution as well as a $200.00 penalty assessment. Jessica

has been serving her sentence at FCI Danbury, in Danbury, Connecticut. She has been continuously detained since April 4, 2019, almost 15 months. Her current estimated release date is in approximately 20 months: February 28, 2022.

At sentencing, Jessica had zero criminal history points under the advisory guidelines and thus fell within criminal history category (CHC) I. Her advisory guideline range was 41 to 51 months (CHC I, TOL 22). The Court sentenced Jessica to 41 months in the Bureau of Prisons, the low end of the range, with 3 years of supervised release to follow. Jessica was ordered to pay a $200.00 penalty assessment and $296,250.00 in restitution to her two victims.

Jessica filed a *pro se* Motion for Immediate Release to Home Confinement on April 25, 2020, asking the Court to send her to home confinement under the CARES Act legislation and 18 U.S.C. § 3624. The government objected, citing both 18 U.S.C. § 3624 as well as the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A). On April 25, 2020, the Court denied Jessica's motion without prejudice, "essentially for the reasons given in the government's opposition, particularly failure to exhaust available administrative remedies [under 18 U.S.C. § 3582]." Jessica filed a response to the government's objection on May 4, 2020, and attached to it, *inter alia*, her requests to staff dated March 26, 2020, and April 24, 2020, requesting release based on her health difficulties and the COVID-19 pandemic which was present in the FCI Danbury facility. On May 14, 2020, Jessica submitted a request for compassionate release utilizing a form that had been given her that purpose from Health Services. She amended and resubmitted that request on May 19, 2020. On May 22, 2020, Jessica received a formal denial from the Warden. All of these requests and the formal denial from the Warden are attached as *Exhibit A*.

Jessica has exhausted her administrative remedies. Both the March 26 and April 24 requests were denied. On May 15, 2020 her request was denied again based on a form she was handed via medical on May 14, 2020. She amended that form and resubmitted it on May 19, 2020. She was denied again, formally by Warden Easter, on May 22, 2020. She resubmitted a BP-9 for the chain of her BP-8, BP-9, and BP-10 which she says the prison authorities have ignored. She went to see a "Ms. Foreman" (apparently the only person authorized to give inmates the proper paperwork for a BP-8, BP-9, BP-10 chain) and was told that there were no BP-10 forms available. All of Jessica's complaints have stopped at a BP-9 since April 2020 because she has not had access to the BP-10 paperwork. She indicates that her requests for compassionate release have been "completely ignored and left with no recourse" since May 22, 2020.

As part of the litigation in *Martinez-Brooks, et al. v. Easter, Warden of FCI Danbury, et al.*, 3:20-cv-00569, Doc. 30 (D. Conn.), Jessica was identified in sealed filings by the authorities at FCI Danbury as a person who is at risk of serious injury or death if she were to contract COVID-19. Nevertheless the facility has declined to release her under the CARES Act or under 18 U.S.C. § 3582.

## II.     Administrative Action Taken Prior to the Filing of this Motion

Jessica has met the exhaustion requirements of 18 U.S.C. § 3582(c)(1)(A), as 30 days have now lapsed since her initial request to the Warden of FCI Danbury for compassionate release was received. 18 U.S.C. § 3582(c)(1)(A). Jessica's requests were submitted to the Warden on March 26, 2020, April 24, 2020, May 14, 2020, and May 19, 2020. She received a formal denial on May 22, 2020, and has tried, without success to appeal since that date. As of the

date of this filing, the 30 days have lapsed since her initial request (no matter which request is relied upon) and her right to proceed on the motion in the district court has ripened.[1]

### III. The Pandemic

    A.    <u>The COVID-19 Crisis.</u>

The spread of COVID-19 has created a global pandemic. As of June 25, 2020 there were at least 2,336,615 known cases and 121,117 deaths in the United States.[2] The number of COVID-19 cases and deaths in the United States continues to rise. *Id.* Fairfield County, Connecticut, where FCI Danbury is located, has been particularly hard hit by the epidemic, with over 16,000 cases (1,751 cases per 100,00 residents), representing more than one-third of that state's cases, and over 1,350 deaths.[3]

Prisons are environments, much like cruise ships or nursing homes, in which the COVID-19 virus can easily gain a foothold and spread rapidly. *See* Craig McCarthy, *Top Rikers Doctor: Coronavirus 'Storm is Coming,'* N.Y. Post (Mar. 19, 2020) ("[W]e cannot change the fundamental nature of jail. We cannot socially distance dozens of elderly men living in a dorm,

---

[1] In *U.S. v. Woodson*, 1:13-cr-20180-CMA, ECF 402 (S.D. Fl .Jun. 5, 2020) (attached as Exhibit B), the government explained that it was "official position of the Department of Justice as well as the Bureau of Prisons" that "a defendant can file a motion for compassionate release in district court 30 days after requesting relief from the Warden, even if the Warden denies relief within the 30 days." In fact, the Bureau of Prison's website says as much: "[U]nder the FSA, an inmate may now file a motion for compassionate release directly with the sentencing court 30 days after making a request to the BOP or after exhausting their administrative remedies." *See* BOP website at https://www.bop.gov/inmates/fsa/faq.jsp#fsa_compassionate_release (under First Step Act: Frequently Asked Questions, Fed. Bureau of Prisons (accessed June 5, 2020)).

[2] *See* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last accessed June 25, 2020).

[3] *See* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/county-map.html?state=CT (last accessed June 25, 2020).

sharing a bathroom. Think of a cruise ship recklessly boarding more passengers each day. . . . Please let as many out as you possibly can.").

Precautionary measures to prevent the spread of the virus are designed to limit crowds and use "social distancing" to lessen the spread of the highly contagious virus. The virus passes through coughing and by contact with surfaces. It "can remain viable and infectious in aerosols for hours and on surfaces up to days."[4] However, the recommended measures for mitigating the spread of COVID-19 are not readily available for incarcerated inmates or correctional employees. Implementing social distancing in congregate settings where people must share sleeping areas, dining halls, bathrooms, showers and other common areas, is often difficult, if not impossible. In addition to the increased opportunities for transmission, there are reduced opportunities to apply necessary hygiene measures in these crowded spaces.

As of June 18, 2020, the Bureau of Prisons website reports that over 6200 federal inmates and nearly 700 staff members tested positive for COVID-19.[5] Eighty-eight federal inmates have died due to the virus. *Id.* These grim statistics rise daily. *See* Exhibit C, a collection of BOP COVID-19 Charts and Graphs. [6]

The adequacy of the BOP's response to the epidemic has been challenged even by those who work within its facilities. A union representing BOP staff filed an "imminent danger report" with the United States Department of Labor Occupational Safety and Health Administration ("OSHA") alleging that the BOP is engaging in actions which are proliferating the spread of

---

[4] van Doremalen, et al, *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, N.E. Journ. Med., Mar 17, 2020, https://www.nejm.org/doi/full/10.1056/NEJMc2004973

[5] *See* https://www.bop.gov/coronavirus/ (last accessed June 25, 2020).

[6] https://federaldefendersny.org/ (using statistics from the BOP's official website)

COVID-19 including: directing staff who have come into contact with individuals who show systems of COVID-19 to report to work and not self-quarantine; failing to introduce workplace controls to mitigate or prevent exposure or further exposure to the virus; failing to modify operations to minimize contact; and failing to provide staff with the proper masks to staff.[7]

B. <u>Conditions at FCI Danbury</u>

A 74-page ruling was issued last month in *Martinez-Brooks, et al. v. Easter, Warden of FCI Danbury, et al.*, 3:20-cv-00569, Doc. 30 (D. Conn.), that directly impacts the merits of the instant motion in terms of the conditions of FCI Danbury, whether "extraordinary and compelling circumstances" exist and the exhaustion of administrative remedies issue. The *Martinez-Brooks* court's decision is attached hereto as Exhibit D.

The U.S. District Court for the District of Connecticut ("the *Martinez-Brooks* court") has granted various forms of relief to the inmate/litigants who brought this habeas corpus petition against the warden of FCI Danbury because of the threat to their safety as inmates at this facility during the pandemic. This relief included granting a temporary restraining order and ordering the warden to provide a list of vulnerable inmates to that court for examination - - and for the warden to explain why she has been effectively asleep at the switch during this health emergency. (5/12/20 ruling, pp. 69-73). Said the court:

> The four inmates, all of whom have COVID-19 risk factors, have made a preliminary showing that **officials at FCI Danbury are making only limited use of their home confinement authority**, as well as **other tools at their disposal to protect inmates during the outbreak, and that these failures amount to deliberate indifference to a substantial risk of serious harm to inmates in violation of the Eighth Amendment**. Accordingly, I grant in part the inmates' motion for a temporary restraining order and issue an order that requires the Warden at FCI Danbury to adopt a process for evaluating inmates with COVID-19 risk factors for home confinement and other forms of release that is both

---

[7] *See* Joe Davidson, Unions for Prison, VA Workers File 'Imminent Danger" Reports about Coronavirus Conditions, Washington Post, (Apr. 9, 2020).

6

far more accelerated and more clearly focused on the critical issues of inmate and public safety than the current process.

(5/12/20 ruling, pp. 1-2 (emphasis added)).

To be clear, the *Martinez-Brooks* court confirms that there is a "significant" COVID-19 outbreak at FCI Danbury. (5/12/20 ruling, p. 7). Further observed the court, "[i]t is **undisputed** that there is an active and serious outbreak of COVID-19 at FCI Danbury." (5/12/20 ruling, p. 43 (emphasis added)). "Since the advent of the emergency, 205 inmates have been tested for COVID-19; sixty-nine inmates and fifty-six staff have tested positive." (5/12/20 ruling, p. 13). Indeed, "[t]he **undisputed evidence** leaves no doubt that FCI Danbury is experiencing an active outbreak of COVID-19." (5/12/20 ruling, p. 44 (emphasis added)).

The *Martinez-Brooks* court further observed:

> **FCI Danbury is experiencing an active COVID-19 outbreak—one of the worst in the federal prison system.** One inmate at the prison has already died as a result of contracting the virus, and it is undisputed that members of the vulnerable subclass face a serious risk of meeting the same fate should they contract the virus. In light of the impossibility of instituting effective social distancing in the setting of a prison, like FCI Danbury, where inmates live and sleep in large dormitories lined with bunk beds, the grave risk to Petitioners persists despite the measures prison officials have taken to combat the virus.

(5/12/20 ruling, p. 58 (emphasis added)).

The conditions in this prison are perfect for transmitting the virus. Here is how the *Martinez-Brooks* court put it:

> The vast majority of the inmates at FCI Danbury live in large dormitory halls lined with bunk beds, each housing roughly 50 or more inmates, with shared bathrooms and common spaces. **This arrangement makes effective social distancing virtually impossible.**

(5/12/20 ruling, p. 7 (emphasis added)). Again, "true social distancing appears to be **unachievable** at FCI Danbury, creating an environment where the risk of transmission is significantly heightened." (5/12/20 ruling, p. 10 (emphasis added)). "Further, the structure of the

7

three facilities at FCI Danbury—even assuming that all reasonable precautions and safety measures are being fastidiously observed (which the Petitioners dispute)—heightens the risk of transmission." (5/12/20 ruling, p. 44).

According to the BOP website, there are currently 2 confirmed active cases among inmates at FCI Danbury. *See* https://www.bop.gov/coronavirus/. On information and belief, many more inmates were recently tested and the results are either pending or have been received but not publicly disclosed.

C. Jessica is at significant risk of death from COVID-19

Jessica has is obese and suffers from diabetes mellitus, type 2, which puts her at significant risk of death if she is infected by COVID-19. The diabetes diagnosis is corroborated in medical records obtained from the BOP as well as in her PSR.[8]

Researchers, doctors, and courts have recognized that diabetes and obesity are significant risk-factors for COVID-19 mortality. The Eastern District of Pennsylvania, in an order releasing an inmate under the compassionate release statute, noted that "An early World Health Organization report on COVID-19 found that '[i]ndividuals at highest risk for severe disease and death include people . . . with underlying conditions such as hypertension [and diabetes].'" Memorandum, *United States v. Jeremy Rodriguez*, 03-cr-00271-AB-1 (E.D.P.A. Apr. 1, 2020). Recent data from the New York Department of Health cites diabetes as one of the most prevalent comorbid conditions, preceded only hypertension.[9] Data publicly posted on June 25, 2020,

---

[8] Jessica's medical records from the BOP are filed under seal with the Court as Exhibit E. They reflect that Jessica is being treated for diabetes mellitus, type 2.

[9] *See* https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?%3Aembed=yes&%3Atoolbar=no (last visited June 25, 2020).

shows that 8,730 of the 24,800 New Yorkers whose death was connected to COVID-19 suffered from diabetes. *Id.* Several hundred of those deaths were people under the age of forty. *Id.*

## ARGUMENT

I. **The Court Should Release Jessica under the Compassionate Release Statute as Extraordinary and Compelling Reasons Warrant such a Sentence Reduction.**

18 U.S.C. § 3582(c)(1)(A)(i) grants the Court the ability to reduce the term of imprisonment of a defendant where its finds that "extraordinary and compelling reasons warrant such a reduction." Jessica's underlying medical conditions (obesity and diabetes) place her at high risk of serious illness and death should she contract COVID-19. She is detained in a facility facing a class-action lawsuit indicating that the prison's conditions place inmates at a heightened risk of infection – a lawsuit in which a Court has already made significant findings that inmates are inadequately protected and has issued a temporary restraining order. In fact, as part of that lawsuit Jessica was identified by the Warden of FCI Danbury as an inmate with COVID Risk Factors, to wit: diabetes mellitus, type 2.

The government has conceded that, given the COVID-19 pandemic, diabetes is an "extraordinary and compelling" reason for release as defined in the application notes to section 1B1.13. *See* "The United States' Unopposed Motion for Remand," pp. 7-8, *United States v. Ramon Garcia*, No. 20-1716, United States Court of Appeals for the Seventh Circuit (filed on June 8, 2020) (attached as Exhibit F). As the government states in the *Garcia* filing,

> … the Centers for Disease Control and Prevention lists diabetes as a risk factor for contracting a more severe form of COVID-19. Centers for Disease Control and Prevention, *People Who Are at Higher Risk for Severe Illness*, May 14, 2020, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. The government's position in this case is consistent with the recent position taken by the Department of Justice's Office of the Solicitor General. *See* Reply in Supp. of Application for Stay, *Williams v. Wilson*, No. 19A1047, at 18, n.4 (June 4, 2020).

*Id.*

Since her initial incarceration, Jessica has struggled to get proper treatment for her diabetes. The diet, first at the jail and then at FCI Danbury, is carbohydrate-rich, and lacking the lean protein and green, leafy vegetables recommended to control diabetes. As a result Jessica's blood sugar levels and A1C have see-sawed dangerously. Jessica has also had a difficult time maintaining access to a working glucometer and test strips, which has made self-monitoring a challenge, at least, and impossible at times. In addition, Jessica's BMI is just shy of 40, the cut-off for morbid obesity.

Jessica has served approximately 40% of her sentence (she has served 15 months and is scheduled to be released in 20 months). On information and belief, based on her PATTERN score, her recidivism risk level is considered minimal. She is a minimum security inmate with no disciplinary history in the Bureau of Prisons. She has a stable, post-release residence to return to, her mother's home in Milford, Massachusetts.[10] Such a situation presents "extraordinary and compelling" reasons to reduce her sentence that are consistent with the sentencing factors of § 3553(a) and § 3852(c)(1)(A).

### A. This Court Has The Authority to Resentence Jessica Under 18 U.S.C. § 3582(c)(1)(A)(i) for the "Extraordinary and Compelling Reasons" Created By The COVID-19 Pandemic and Prison Conditions.

Federal courts may reduce a prisoner's sentence under the circumstances outlined in 18 U.S.C. § 3852(c). Under § 3852(c)(1)(A)(i), a court may reduce a prisoner's sentence "if it finds that" (1) "extraordinary and compelling reasons warrant such a reduction" and (2) the reduction is "consistent with applicable policy statements issued by the Sentencing Commission."

---

[10] Defense counsel has confirmed this with Jessica's mother, Susan Teixeira, of Milford, Massachusetts. The residence appears to be suitable for supervision, with no firearms present and no dangerous animals.

10

Congress never defined the term "extraordinary and compelling reasons," except to state that "[r]ehabilitation . . . alone" does not suffice. 18 U.S.C. § 994(t). The Sentencing Guidelines' definition of the term[11], which has not been updated since the statutory release scheme was amended by the First Step Act, has been interpreted to allow for a broad understanding of "extraordinary and compelling reasons."[12]

Numerous courts have concluded that the pandemic, in conjunction with an underlying medical susceptibility and crowded prison conditions, provides extraordinary and compelling reasons justifying compassionate release. *See United States v. Muniz,* 2020 WL 1540325 (E.D. Wis. Mar. 30, 2020) (granting compassionate release to inmate with end stage renal disease,

---

[11] *See* U.S.S.G. §1B1.13 cmt. n.1(A)-(D). The Application Note to U.S.S.G. §1B1.13, the Commission enumerated three specific "reasons" that qualify as "extraordinary and compelling": (A) terminal illness diagnoses or serious medical, physical or mental impairments from which a defendant is unlikely to recover, and which "substantially diminish" the defendant's capacity for self-care in prison; (B) aging-related health decline where a defendant is over 65 years old and has served at least ten years or 75% of his sentence; or (C) two family related circumstances: (i) death/incapacitation of the only caregiver for the inmate's children or (ii) incapacitation of an inmate's spouse, if the inmate is the spouse's only caregiver. See id. cmt. n.1(A)-(C). The policy statement also added a catchall provision that gave the Director of the BOP the authority to determine if "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with" the other three categories. *Id.* cmt. n.1(D).

[12] *See United States v. Urkevich*, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019) (noting that §1B1.13 never "suggests that [its] list [of criteria] is exclusive"); *United States v. Beck*, 2019 WL 2716505, at *8 (M.D.N.C. June 28, 2019) ("Read as a whole, the application notes suggest a flexible approach . . . [and] recognize that the examples listed in the application note do not capture all extraordinary and compelling circumstances."); *United States v. Beck*, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019) (the "old policy statement provides helpful guidance, [but] . . . does not constrain [a court's] independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3852(c)(1)(A)."); *United States v. Fox*, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) ("[D]eference to the BOP no longer makes sense now that the First Step Act has reduced the BOP's role. I treat the previous BOP discretion to identify other extraordinary and compelling reasons as assigned now to the courts."); *United States v. Bucci,* 409 F.Supp. 1, 2 (D. Mass. 2019) (holding that "the Commission's existing policy statement provides helpful guidance on the factors that support compassionate release, although it is not ultimately conclusive").

11

diabetes, and arterial hypertension and noting that "while the Court is aware of the measures taken by the Federal Bureau of Prisons, new reports of the virus's spread in detention centers within the United States and beyond our borders in China and Iran demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection."); *United States v. Campagna*, 2020 WL 1489829 (S.D.N.Y. Mar. 27, 2020) (holding that Defendant's compromised immune system, taken in concert with the COVID-19 public health crisis, constitutes an extraordinary and compelling reason to modify to Defendant's sentence); *United States v. Jepsen*, 2020 WL 1640232 at *5 (D. Conn. Apr. 1, 2020) (inmate who is immunocompromised and suffers from multiple chronic conditions demonstrated "extraordinary and compelling" circumstances); *United States v.Resnick*, 2020 WL 1651508 (S.D.N.Y. Apr. 2, 2020) (inmate with diabetes and end-state liver disease demonstrated "extraordinary and compelling circumstances"); *United States v. Zuckerman*, 2020 WL 1659880 at *5 (S.D.N.Y. Apr. 3, 2020) (Zuckerman's age combined with his diabetes, hypertension and obesity satisfy the "extraordinary and compelling reasons" requirement); *United States v. White,* 00-30027-MGM (D. Mass. April 10, 2020) (granting compassionate release, waiving exhaustion requirement, for 52 year old inmate being held at MDC Brooklyn with no significant underlying health issues); *see also* Doug Berman, Sentencing Law and Policy, *Additional COVID-influenced grants of federal sentence reductions using § 3582(c)(1)(A)* https://sentencing.typepad.com/sentencing_law_and_ policy/2020/04/additional-covid-influenced-grants-of-sentence-reductions-using-3582c1a.html (listing cases granting compassionate release related to COVID-19).

### B. Jessica satisfied the 30-Day Requirement for Exhaustion of Administrative Remedies Under 18 U.S.C. § 3582(c)(1)(A).

18 U.S.C. § 3582(c)(1)(A) allows for a modification "upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the

Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

Jessica made numerous requests for compassionate release, from March through May of 2020, culminating with a request she made on May 19, 2020. *Exhibit A*. The Warden formally denied her request on May 22, 2020. *Id.* Jessica has attempted to appeal after May 22, 2020, but has been told that the requisite forms are not available. The May 19, 2020, request meets the 30-day statutory precondition, as of June 19, 2020, and thus the requirements of 18 U.S.C. § 3582(c)(1)(A) have been met.

### C. A Sentencing Reduction is Warranted under the 3553(a) Factors.

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in §3553(a) to determine whether a sentencing reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). As currently scheduled, the BOP expects to release Jessica in February 2022. The Court is being asked to amend a 41-month incarcerative sentence followed by 3 years of supervision to approximately an effective 18-month incarcerative sentence (considering good time) followed by a period of home confinement and the same 3-year period of supervision.

Prior to this 41-month sentence, Jessica had not served any amount of time in jail or prison. She was a criminal history category I with zero criminal history points at sentencing. She is a minimum security inmate with no disciplinary history in the Bureau of Prisons. She was assessed for home confinement under the CARES Act and deemed ineligible based on having pending charges in Rhode Island and Massachusetts which have not been resolved; having more than 18 months remaining on her sentence (she has 20 months remaining); and

not having served 50% of her current sentence (she has served approximately 40% of her sentence).

## CONCLUSION

For the foregoing reasons, Jessica Teixeira respectfully requests that the Court grant a reduction in her sentence to convert his remaining prison sentence (approximately 20 months) or a portion thereof to home confinement or schedule a hearing on the matter.

The Government, through AUSA John Davis has been contacted in regards to this motion and will respond accordingly. Defense counsel understands that the government will likely object to the granting of this motion. DCUSPO Kevin Lavigne and SUSPO Laura Roffo have also been apprised of the filing of this motion.

Respectfully submitted,

Date: June 25, 2020

/s/ Jeffrey S. Levin
N.H. Bar No. 12901
Assistant Federal Defender
Federal Defender Office
22 Bridge Street
Concord, NH 03301
Tel. (603) 226-7360
E-mail: Jeff_Levin@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that the above document was served on June 25, 2020 to all counsel of record and in the manner specified herein: electronically served through CM/ECF. Exhibit E (defendant's BOP medical records) will be filed under seal tonight by email to the Clerk of Court with an accompanying motion to seal, with the assent of the government.

/s/ Jeffrey S. Levin